IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

RORY GRIFFIN,

        Plaintiff,

v.                                                          Case No. 3:21-CV-00436-NJR

DENNIS LARSON, and
STEVEN D. YOUNG,

        Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Rory Griffin, an inmate of the Illinois Department of Corrections ("IDOC"), tore his left bicep muscle while lifting weights at Big Muddy River Correctional Center ("Big Muddy"). Defendants Dr. Dennis Larson and Dr. Steven Young were among the physicians who treated Griffin's injuries from this unfortunate event. According to Griffin, however, their care was constitutionally inadequate, and thus a violation of the Eighth Amendment's ban on cruel and unusual punishment.

Now pending before the Court are two motions for summary judgment: one filed by Dr. Young (Doc. 87), and one filed Dr. Larson (Doc. 88). Based on the undisputed facts presented in the record, the Court grants Dr. Young's motion for summary judgment and denies Dr. Larson's.

### BACKGROUND

At all relevant times, Plaintiff Rory Griffin was an IDOC inmate at Big Muddy. Larson Statement of Undisputed Material Facts ("SOF") at ¶ 1, (Doc. 89). Dr. Larson was

at all relevant times a medical doctor at Big Muddy. *Id.* at ¶ 2. Dr. Young is an orthopedic surgeon at the Orthopedic Institute of Southern Illinois. Young SOF at ¶¶ 2, 4, (Doc. 87).

On April 19, 2019, Griffin injured his left bicep muscle while lifting weights at Big Muddy. *Id.* at ¶ 1. That day, he was seen by a physician's assistant ("PA") and diagnosed with a "presumptive left bicep tear." Larson SOF at ¶ 4. The PA discussed Griffin's condition with Dr. Larson, and both agreed that a referral to an orthopedic specialist was in order. *Id.* The PA applied ice to the "visible deformation" that resulted from Griffin's injury and ordered a sling for his left arm. *Id.*

On May 3, 2019, Dr. Larson treated Griffin's injury for the first time. *Id.* at ¶ 5. Dr. Larson also approved Griffin for two forms of further treatment through collegial review: (i) an MRI on May 8, 2019, which revealed a left distal bicep tear; and (ii) an orthopedic consultation with the Neuromuscular Orthopedic Institute. *Id.* at ¶¶ 5, 6. The Neuromuscular Orthopedic Institute indicated that it would not be able to perform a surgery on Griffin's left arm until July 2019 and that the injury required a more immediate intervention. *Id.* at ¶ 7. Thus, on June 4, 2019, Dr. Larson approved a surgical consultation with Dr. Young, who met with Griffin on June 13. *Id.* at ¶ 8. On June 14, Dr. Larson approved Griffin's left distal bicep repair surgery with Dr. Young. *Id.*

1. <u>First Surgery</u>

On June 24, 2019, Dr. Young surgically repaired Griffin's left distal bicep tear. Young SOF at ¶ 4. The surgery required the insertion of a nonabsorbable suture on the subcutaneous border of the elbow to secure the tendon in place. *Id.* at ¶ 8. The suture is a foreign object, which can cause a patient to develop a mass or granuloma around the site

of the suture. *Id.* at ¶ 9. After the surgery, Dr. Young wrote Griffin a prescription for 30 tablets of Norco 7.5 milligrams (a pain medication), which was consistent with his prescription practices for other patients undergoing the same surgery. *Id.* at ¶ 10.

Griffin returned to Big Muddy that same day. Larson SOF at ¶ 9. Instead of the prescription for Norco that Dr. Young had ordered, Dr. Larson prescribed him a three-day supply of Tylenol #3 (codeine/acetaminophen). *Id.* at ¶ 9. He refilled the same three-day prescription for Tylenol #3 on June 28 and July 5, 2019. *Id.* The reason for Dr. Larson's decision to prescribe Tylenol #3 is disputed. Dr. Larson notes that he relied on Tylenol #3 as a "therapeutic substitute" because Norco was not available onsite at Big Muddy. *Id.* at ¶ 10. Griffin, on the other hand, notes that Dr. Larson testified that there were "no restriction[s]" on the types of pain medications available to him. Griffin's Response to Dr. Larson's SOF, (Doc. 97 at 5); Dr. Larson Dep. Tr. at 15, (Doc. 89-2).

On July 16, 2019, Griffin returned to Dr. Young's office for a follow-up appointment where his cast was removed, and a physical examination revealed that "his incision sites were healing well." Young SOF at ¶ 12. Griffin asked Dr. Young's PA Phillip Erthall about a "knot" (granuloma) that had developed near the suture site, and why it "feels like bees stinging me here." Griffin's Response to Dr. Young's SOF ¶ 12, (Doc. 95 at 5); Plaintiff Dep. Tr. at 12, (Doc. 87-3). Griffin's arm was placed in a long arm cast, and he was instructed to follow up again in three to four weeks, at which time he would begin physical therapy. *Id.* On August 9, 2019, Griffin returned for a second follow-up appointment with Dr. Young's office. Young SOF at ¶ 13. Although a physical examination "revealed no erythema, no edema, and no drainage from the incision sites,"

Griffin had limited range of motion. *Id.* To address his limited range of motion, Dr. Young's office ordered him to undergo a physical therapy regimen, which Dr. Larson approved. *Id.*; Larson SOF at ¶ 11. Griffin visited Dr. Young's office three more times between August 9 and November 21, 2019: (i) on September 13, he reported that he "had been going to physical therapy and . . . that the limited flexion and extension of his wrist was improving," Young SOF at ¶ 14;" (ii) on October 25, 2019, a physical exam showed improvement in the flexion and extension of his elbow, and a compression sleeve was ordered to address symptoms of numbness, *Id.* at ¶ 15; and (iii) on November 21, 2019, Dr. Young's office ordered a nerve conduction study and additional physical therapy to address continued numbness and tingling in Griffin's left hand. *Id.* at ¶ 16.

Physical Therapist ("PT") Dan Varel began treating Griffin on August 21, 2019, to improve his range of motion. Larson SOF at ¶ 12. Throughout October 2019, Griffin attended five physical therapy sessions with PT Varel, and Dr. Larson treated him personally on October 30 to address ongoing mobility issues in his left arm. *Id.* at ¶ 13. Griffin completed another six physical therapy sessions in November 2019, and on December 9, Dr. Larson approved the nerve conduction test to assess his "continued left arm/hand discomfort." *Id.* at ¶ 16.

On March 5, 2020, Griffin completed the nerve conduction study at St. Mary's Hospital in Centralia, Illinois. *Id.* at ¶ 16; (Doc. 87-1 at 61). The examining physician noted "mild left carpal tunnel syndrome and mild left ulnar nerve neuropathy at [Griffin's] elbow and wrist." Young SOF at ¶ 18. On March 13, 2020, Griffin returned to Dr. Young's office to discuss the numbness in his arm and hand. *Id.* at ¶ 19. PA Erthall explained that

he may be suffering from carpal and cubital tunnel syndromes and recommended that he undergo a carpal tunnel release and endoscopic ulnar nerve decompression. *Id.* On March 17, 2020, Dr. Larson ordered a collegial review for a second orthopedic surgery. Larson SOF at ¶ 19. The second surgery was approved on March 31, 2020. *Id.* at ¶ 21. Unfortunately, Griffin was unable to undergo a second surgery right away due to restrictions associated with COVID-19. *Id.* Griffin's second surgery with Dr. Young was ultimately rescheduled for August 14, 2020. *Id.* at ¶ 23. Griffin was also scheduled for a rheumatology consultation with an external provider, Dr. Akhter, on April 21, 2020. *Id.* at ¶ 20. This consultation was also rescheduled twice before taking place on August 18, 2020. *Id.* at ¶ 22.

2. <u>Second Surgery</u>

On August 14, 2020, Dr. Young performed a left endoscopic cubital tunnel decompression and left carpal tunnel release surgery. Young SOF at ¶ 20. After the surgery, Griffin received two tabs of Norco by mouth, and Dr. Young prescribed 20 more tabs for Griffin to take as needed for post-operative pain. *Id.* at ¶¶ 22-23. The prescription for Norco was consistent with Dr. Young's prescribing practices for other patients who underwent this surgery. *Id.* at ¶¶ 24. Upon his return to Big Muddy, Dr. Larson again prescribed Griffin a three-day supply of Tylenol #3, scheduled a collegial review for a two-week follow-up appointment with Dr. Young, and referred him to physical therapy. Larson SOF at ¶ 25. On August 17, 2020, after Griffin requested additional pain medication, Dr. Larson renewed Griffin's Tylenol #3 prescription and refreshed Griffin's prescription for Tylenol 325mg. *Id.* at ¶ 26.

On August 18, 2020, Griffin attended his rheumatology consultation with Dr. Akhter. *Id.* at ¶ 27. Dr. Akhter recommended additional imaging and bloodwork, increasing Griffin's prescription of Methotrexate (a rheumatoid arthritis medication) to nine pills per week depending on lab results, and a prescription for Enbrel or Humira. *Id.*

On August 28, 2020, Griffin attended a follow-up visit at Dr. Young's office where he met with PA Erthall. Young SOF at ¶ 27. His physical exam revealed that he had "full range of motion of his left wrist and was able to make a complete fist and extend all fingers past neutral." *Id.* On September 30, 2020, Griffin visited Dr. Young's office for a six-week post-operative follow-up appointment. *Id.* at ¶ 28. During this visit, Griffin complained of "mild incisional tenderness at the carpal tunnel site" and reported the development of a painful eschar (a collection of dry, dead tissue within a wound) near the incision site." *Id.* PA Erthall prescribed a compression sleeve and instructed him to follow up as needed. *Id.* Dr. Larson ordered the compression sleeve for Griffin on October 1, 2020. Larson SOF at ¶ 33.

In September 2020, Griffin also met with Dr. Akhter (the rheumatologist) and PT Varel. *Id.* at ¶¶ 29, 31. PT Varel noted that "[Griffin]'s left arm range of motion and strength improved," and thus he recommended that physical therapy be discontinued. *Id.* at ¶ 31. Dr. Akhter, however, recommended prescribing Enbrel to treat Griffin's arthritis. *Id.* at ¶ 34. On October 2, 2020, Dr. Larson prescribed Griffin Enbrel 50 milligrams once a week for three months and ordered a collegial review for a rheumatology follow-up with Dr. Akhter in two months. *Id.* at ¶ 35. Although the follow-up visit with Dr. Akhter was approved, it was rescheduled several times due to ongoing

COVID-19 restrictions. *Id.* When Griffin met with Dr. Akhter again on March 22, 2021, he reported that Enbrel had not effectively treated his arthritis pain. *Id.* at ¶ 36. Dr. Akhter thus recommended that Griffin's prescription pain medication be switched to Humira, which Dr. Larson approved two days later. *Id.*

    3.  <u>Third Surgery</u>

On March 24, 2022, Griffin attended an external consultation with Dr. Peter Mulhern. *Id.* at ¶ 39. Griffin complained of "a small lump located on the underside of his left forearm near the incision site from his left distal biceps tendon repair surgery" which was sensitive and painful. *Id.* Dr. Mulhern explained that the loss of full extension and some supination is consistent with a biceps repair surgery and subsequent immobilization after surgery. Young SOF at ¶ 29. Nevertheless, Dr. Mulhern discussed with Griffin the possibility of removing the foreign object granuloma that had ostensibly developed from his first bicep repair surgery in June 2019. Larson SOF at ¶ 39.

On April 19, 2022, Griffin underwent a third surgical procedure to excise the "suture granuloma of his left forearm." *Id.* at ¶ 40. This surgery was completed without complications. *Id.* Seven months later, on November 19, 2022, Griffin was transferred from Big Muddy to Pinckneyville Correctional Center. *Id.* at ¶ 41.

    4.  <u>Administrative Review</u>

Griffin filed ten administrative grievances between November 18, 2019, and February 23, 2022. Young SOF at ¶¶ 33a-j. At least five of these grievances concerned or at least implicated the medical care he received for his left bicep injury. *Id.* at ¶¶ 33b-d, g, j.

On February 4, 2020, Griffin filed Grievance No. 16-2-20, in which he complained of pain in his wrists and fingers and requested testing for nerve damage. *Id.* at ¶ 33b; (Doc. 87-6 at 14). On April 28, 2020, Griffin filed Grievance No. 88-4-20, in which he noted that he had surgery on his left arm, and that it had caused him "a lot of issues," including numbness in his arm. Young SOF at ¶¶ 33c; (Doc. 87-6 at 29). He thus requested another surgery to "fix" these issues. *Id.* On November 23, 2020, Griffin submitted Grievance No. 58-11-20, in which he complained of "sharp" pain in his left arm and elbow, again expressed his suspicion that he might have nerve damage, explained that he had had "two surger[ies] on [his] arm" and was in pain "all the time," and alleged that his complaints of pain had been "ignored." Young SOF at ¶¶ 33d; (Doc. 87-6 at 79). On May 28, 2021, Griffin filed Grievance No. 106-5-21, which stated that he continued to experience pain in his left arm, that he had been trying to see Dr. Larson to address it, and that he needed pain medications that were stronger than ibuprofen. Young SOF at ¶¶ 33g; (Doc. 87-6 at 23). And finally, on February 23, 2022, Griffin submitted Grievance No. 247-2-22, in which he explained that he had "nerve damage" in his left arm "d[ue] to surgery," that a "screw" was poking out of his arm, and he requested that he be seen by a specialist to address these concerns. Young SOF at ¶¶ 33j; (Doc. 87-6 at 47).

## LEGAL STANDARD

Summary judgment is proper if the moving party can demonstrate, through pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, that there is no genuine issue as to any material fact and that, as a result, they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986); *see also Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). "A genuine dispute over a material fact exists if 'the evidence is such that a reasonable jury could return a verdict' for the nonmovant." *Machicote v. Roethlisberger*, 969 F.3d 822, 827 (7th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material if it might affect the outcome of a suit under the relevant substantive law. *Ruffin-Thompkins*, 422 F.3d at 607.

To determine if a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). But "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (internal citation omitted).

The moving party bears the burden of establishing that no material facts are in genuine dispute and any doubt as to the existence of a genuine issue must be resolved against the moving party. *Lawrence v. Kenosha Cnty.*, 391 F.3d 837, 841 (7th Cir. 2004). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *Celotex Corp.*, 477 U.S. at 322-24.

## DISCUSSION

Both Defendants contest Griffin's substantive Eighth Amendment claims against them, arguing that the evidence does not support a finding of deliberate indifference.

Dr. Young also argues that Griffin has failed to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"). The Court will address Dr. Young's administrative exhaustion argument first before turning to his and Dr. Larson's arguments on the merits.

1. Exhaustion of Administrative Remedies

Under the PLRA, "[n]o action shall be brought with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This means that "the inmate must file a timely grievance utilizing the procedures and rules of the state's prison grievance process." *Maddox v. Love*, 655 F.3d 709, 720 (7th Cir. 2011). The prison itself, not the PLRA, establishes the procedural rules that a prisoner must follow to meet the administrative exhaustion requirement. *Id.* at 721. In Illinois, these rules are set by the state's Administrative Code, which requires a grievance to be filed within 60 days "after discovery of the incident." ILL. ADMIN. CODE tit. 20, § 504.810(a). Substantively, a grievance must contain "factual details regarding each aspect of the offender's complaint, including what happened, when, where and the name of each person who is the subject of or who is otherwise involved in the complaint." *Id.* § 504.810(c). If the offending official's name is unknown, "the offender must include as much descriptive information about the individual as possible." *Id.*

Dr. Young argues that Griffin failed to comply with the grievance procedures of the Illinois Administrative Code because "none of [his grievances] name or discuss the surgeries performed by Dr. Young." (Doc. 87 at 11). And because of this omission, Dr. Young argues, Griffin's grievances could not have "possibly place[d] [him] on notice

that Plaintiff claimed his treatment was insufficient." *Id.* at 12-13.

These arguments reflect a misunderstanding of the administrative exhaustion requirement. Even the most cursory review of Griffin's grievances and medical records identifies his surgical history with respect to his torn left bicep. It is undisputed that Dr. Young performed the first two of Griffin's three bicep surgeries. And at least five of Griffin's grievances in the record mention either his arm pain, his surgeries, or both.[1]

Administrative exhaustion offers the prison an opportunity to provide an institutional response to the inmate's grievance; it is not intended to provide notice of a potential legal claim against individual defendants. *See Westefer v. Snyder*, 422 F.3d 570, 580 (7th Cir. 2005) (PLRA serves to "alert the prison to the nature of the wrong for which redress is sought") (internal alteration and quotation marks omitted); *Lyke v. Dixon Corr. Ctr.*, No. 21 C 50066, 2022 WL 3355317, at *6 (N.D. Ill. Aug. 15, 2022) ("An inmate is not required to provide personal notice of suit to an individual defendant through his grievance."). The fact that Griffin's grievances do not use "Dr. Young" as a triggering

---

[1] Dr. Young argues that only four of Griffin's administrative grievances qualify for consideration based on the date on which they were submitted. This is so, Dr. Young argues, because he only treated Griffin from June 13, 2019, until September 30, 2020. And because section 504.810(a) requires grievances to be filed within 60 days "after discovery of the incident," only grievances filed between June 13, 2019, and November 29, 2020, should be considered for administrative exhaustion purposes. Even if the Court limited its review to the four grievances that Dr. Young identifies, it is apparent that three of them properly conveyed Griffin's concerns about the treatment he was receiving. Grievance No. 16-2-20 was filed on February 4, 2020—it noted pain in Griffin's wrists and fingers and requested testing for nerve damage. Considering Dr. Young first operated on Griffin's bicep on June 24, 2019, Dr. Young's relevance to this grievance is apparent. Grievance No. 88-4-20 was filed on April 28, 2020, and it alleged that the first surgery on Griffin's left arm (which Dr. Young performed) caused him "a lot of issues" including numbness in his arm. Grievance No. 58-11-20 was filed on November 23, 2020 (after the second surgery) and it complained of "sharp" pain in Griffin's left arm and elbow, explained that he had had "two surger[ies] on [his] arm," and asserted that he was in pain "all the time." Here too, the relevance to Dr. Young's surgeries on Griffin's left arm is obvious. Only Grievance No. 73-11-19, which was filed on November 18, 2019, appears to be unrelated to Dr. Young's treatment of Griffin because it concerned clothing.

buzzword does not undermine administrative exhaustion. In a case that raised the same issue as Dr. Young does here, the Seventh Circuit recognized that the plaintiff's failure to "specifically name the defendants in the grievance was a mere technical defect that had no effect on the process and didn't limit the usefulness of the exhaustion requirement." *Maddox*, 655 F.3d at 722; *see also Lyke*, 2022 WL 3355317, at *6 (failure to name individual defendants did not undermine administrative exhaustion). The same is true here. Because Griffin's grievances easily permitted an inference that Dr. Young was one of their subjects (if not *the* subject), they "served [their] function of alerting the state and inviting corrective action." *Maddox*, 655 F.3d at 722; *see also Ambrose v. Godinez*, No. 11-3068, 510 F. App'x. 470, 472 (7th Cir. Feb. 22, 2013) (requiring grievance to identify responsible officials "by name *or inference*") (emphasis added). Thus, the Court finds that, with respect to Dr. Young, Griffin properly exhausted the administrative grievance process available to him.

### 2. Deliberate Indifference

A prison official or care provider's "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Prison officials, including physicians and medical staff, violate the Eighth Amendment only when two requirements are met: (1) the alleged deprivation is objectively, sufficiently serious, and (2) the prison official had a sufficiently culpable state of mind. *Thomas v. Martija*, 991 F.3d 763, 768 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The requisite state of mind is deliberate indifference. *Id.*

For the first element, a medical condition is objectively serious if "a physician has

diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1022-23 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). A medical condition need not to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

As to the second element, a plaintiff must show that a prison official had subjective knowledge of—and then disregarded—an excessive risk to his health. *Id.* The plaintiff need not show the defendant "literally ignored" his complaint, but that the defendant knew of the condition and either intentionally or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). Deliberate indifference involves intentional or reckless conduct, not medical malpractice. *Pyles*, 771 F.3d at 409. A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care or receive the best care possible. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

Assessing the second element is more challenging in cases concerning inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). This is in contrast to a case "where evidence exists that the defendant knew better than to make the medical decision that he did." *Id.* (cleaned up). For deliberate indifference, a medical provider's treatment decision must radically depart from accepted professional judgment, practice, or standards such that a jury could reasonably infer that the decision was not actually based on professional judgment. *Whiting*, 839 F.3d at 663. In

other words, treatment that is so blatantly inappropriate as to be divorced from any medical judgment can lead to a finding of deliberate indifference. *Anderson v. Randle*, 451 F. App'x. 570, 572 (7th Cir. 2011).

Neither Defendant contests the objective seriousness of Griffin's injury.[2] Thus, the Court will confine its analysis to the second element of the Eighth Amendment inquiry: whether Drs. Young and Larson were deliberately indifferent to Griffin's medical needs. *See White v. Woods*, 48 F.4th 853, 862 (7th Cir. 2022).

   a. *Dr. Young*

Dr. Young performed two surgeries on Griffin's left arm. First, on June 24, 2019, he repaired Griffin's left distal bicep tear, which required the insertion of a nonabsorbable suture on the subcutaneous border of the elbow to secure the tendon in place. Second, on August 14, 2020, Dr. Young performed a left endoscopic cubital tunnel decompression and left carpal tunnel release surgery to address symptoms that had ostensibly arisen after the first surgery. In both instances, Dr. Young prescribed Griffin Norco 7.5 milligrams, which was consistent with his prescription practices for other patients undergoing the same surgeries. Between June 13, 2019, and September 30, 2020, Griffin visited Dr. Young's office eleven times to discuss his surgeries and symptom management.

Deliberate indifference can present itself in many ways. Plaintiffs must often rely on circumstantial evidence that permits an inference of culpability because a physician is

---

[2] Dr. Larson notes that the seriousness of Griffin's injury is "questionable," but he offers no substantive argument in support of the proposition that the injury is *not* sufficiently serious to satisfy the Eighth Amendment inquiry. (Doc. 89 at 11).

unlikely to admit that he knew his treatment would not help an inmate and that he persisted in that course of treatment anyway. *Petties v. Carter*, 836 F.3d 722, 729-31 (7th Cir. 2016) (en banc) (collecting cases). Griffin argues that Dr. Young's "delayed and ineffective" bicep repair surgery is evidence of deliberate indifference. This is so, according to him, because Dr. Young took more than two months after Griffin's injury to perform the first surgery and was not sufficiently attentive to his complaints of pain and the development of a granuloma near the suture site.

"[A]n inexplicable delay in treatment which serves no penological interest" can support a finding of deliberate indifference. *Id.* at 730. But here, the record supports no such inference. Dr. Young was not consulted as a candidate to perform Griffin's surgery until after the Neuromuscular Orthopedic Institute told Dr. Larson that it could not perform Griffin's surgery until July 2019 and urged him to schedule the surgery with someone else sooner. That is why Dr. Young entered the picture when he did. Griffin's surgical consultation with Dr. Young was approved on June 4, 2019, the consultation took place on June 13, the surgery was approved on June 14, and ten days after that, it was done. "[D]elays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id.* Here, the record reveals no evidence that impugns the integrity of Dr. Young's medical decision-making or the urgency with which he treated the referral to repair Griffin's bicep. Griffin has offered no evidence (expert or otherwise) that supports the proposition that the eleven-day delay between Dr. Young's first meeting with Griffin and his performance of the surgery reflected a deliberately

indifferent state of mind. *Compare Perez v. Fenoglio*, 792 F.3d 768, 778 (7th Cir. 2015) ("ten-month delay from the time of [plaintiff's] injury until the time he received meaningful treatment in the form of surgery" supported claim of deliberate indifference). Rather, the eleven-day period between the surgical consult and the day of Dr. Young's first surgery "is consistent with the realities of scheduling medical appointments, both in the correctional context and for private citizens." *Page v. Obaisi*, 318 F. Supp. 3d 1094, 1101 (N.D. Ill. 2018). "Delaying treatment, even if not life threatening, can be evidence of deliberate indifference. But delays can also be reasonable." *Wilson v. Adams*, 901 F.3d 816, 822 (7th Cir. 2018) (internal citations omitted). Here, the record reveals no evidence suggesting that the delay in Dr. Young's treatment of Griffin was anything but reasonable. *See Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009) (explaining that Eighth Amendment claim based on delay will fail "unless the plaintiff introduces verifying medical evidence that shows his condition worsened because of the delay").

Griffin also argues that Dr. Young was deliberately indifferent to his complaints of post-surgical nerve pain and the development of a granuloma. At his first post-surgical visit with Dr. Young's office, Griffin told PA Erthall about a "knot" (granuloma) that had developed near the suture site and asked him why it "feels like bees stinging me here." Griffin contends that because Dr. Young "knew about and disregarded both conditions," the evidence permits an inference of deliberate indifference. But this assertion is not supported by the record. In his first post-operative visit to Dr. Young's office, PA Erthall placed Griffin's arm in a long arm cast and instructed him to follow up in three to four weeks, at which time he would begin a physical therapy regimen. That is precisely what

happened as Griffin began physical therapy with PT Varel on August 21, 2019. Griffin visited Dr. Young's office again in August, September, and October 2019 to discuss his progress and physical therapy. On October 25, 2019, Dr. Young's office ordered a compression sleeve to address Griffin's ongoing arm numbness. Then, on November 21, 2019, Dr. Young ordered a nerve conduction study, which Dr. Larson approved on December 9, 2019. On March 5, 2020, Griffin underwent the nerve conduction study as Dr. Young recommended. And when the nerve conduction study revealed "mild left carpal tunnel syndrome and mild left ulnar nerve neuropathy at [Griffin]'s elbow and wrist," Dr. Larson and Dr. Young scheduled Griffin for a cubital tunnel decompression and left carpal tunnel release surgery, which took place on August 14, 2020.

Dr. Young's treatment of Griffin's nerve pain proceeded through various phases. He ordered physical therapy, a compression sleeve, and a nerve conduction study. When none of these interventions resolved Griffin's nerve pain, he recommended and performed a second surgery. There is no evidence to suggest that this treatment program so radically departed from an accepted standard of care that Dr. Young's subjective indifference could be inferred. Another doctor might disagree with the various forms of treatment Dr. Young applied. But that is, at most, medical malpractice, not deliberate indifference. The Supreme Court recognized this distinction in *Estelle* when it observed that "the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And when, as here, all reasonable inferences in Griffin's favor fail to produce evidence of subjective indifference—*i.e.*, that the defendant *knew* his course of treatment

was ineffective—summary judgment is appropriate. *Whiting v. v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016); *see also Duckworth v. Ahmad*, 532 F.3d 675, 680 (7th Cir. 2008) (although immediate cystoscopy may have been "prudent," failure to do so was not evidence of deliberate indifference).

Finally, Griffin argues that deliberate indifference can be inferred from the "years" long delay in diagnosing and removing his granuloma. But here again, the record paints a different picture. It is undisputed that a granuloma may develop from the type of bicep repair surgery that Dr. Young performed. And Griffin asked PA Erthall about it during his first post-operative visit with him on July 16, 2019. But what the record does not show is any indication that Dr. Young disregarded Griffin's concern. Dr. Young and his team addressed a host of symptoms that Griffin brought to their attention over the course of eleven visits that took place at near monthly intervals between June 2019 and September 2020. Griffin's primary concern at the time was his nerve pain, which Dr. Young addressed through numerous forms of treatment and a second surgery. The fact that Dr. Young structured his treatment of Griffin's injury based on the concerns that appeared most pressing is a form of medical judgment, not deliberate indifference. *Holloway v. Delaware Cnty. Sheriff,* 700 F.3d 1063, 1074 (7th Cir. 2012) (prison doctor "is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards."); *Snipes v. DeTella,* 95 F.3d 586, 591 (7th Cir. 1996) ("What we have here is not deliberate indifference to a serious medical need, but a deliberate decision by a doctor to treat a

medical need in a particular manner.").

Notably, neither Griffin nor Dr. Mulhern questioned the medical soundness of Dr. Young's decision to insert a nonabsorbable suture when he performed the first bicep repair surgery. Nor is it disputed that this was the reason Griffin developed the granuloma that Dr. Mulhern removed in April 2022. Although the Court does not doubt that Griffin's granuloma caused him discomfort and pain, the record contains no evidence that any aspect of Dr. Young's treatment of it deviated from an accepted standard of care. So, where Dr. Young's treatment fell within the range of acceptable medical judgment, it can hardly be said that he acted with deliberate indifference. And while the "years" long delay between the bicep repair surgery in June 2019 and the granuloma removal surgery in April 2022 is significant in isolation, the record reveals Dr. Young's continuous treatment of Griffin's injuries and symptoms, even against the backdrop of an unprecedented pandemic that arose in the middle of Griffin's treatment. Anyone who lived through the COVID-19 pandemic in 2020 and 2021 understands how disruptive it was to all forms of medical care, and that delays in treatment were the norm, rather than the exception at the time. So, without evidence to suggest that the delay in the granuloma removal surgery was attributable to Dr. Young's subjective indifference, summary judgment is appropriate as to Griffin's claim under the Eighth Amendment against Dr. Young.

b.  *Dr. Larson*

As a medical doctor at Big Muddy, Griffin was committed to Dr. Larson's care for the duration of his detainment there. Thus, Dr. Larson was entrusted with the treatment

of Griffin's left bicep tear from April 19, 2019, when the injury occurred, until November 19, 2022, when Griffin was transferred from Big Muddy to Pinckneyville Correctional Center. Over the course of this three-and-a-half-year period, Dr. Larson, in many instances, appears to have exercised his good faith professional judgment. But in certain situations, his treatment decisions raise the specter of deliberate indifference, which is all Griffin needs to survive summary judgment. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) ("[E]vidence that a medical professional knew better than to make the medical decision that he did is enough to survive summary judgment.") (cleaned up).

As noted, an Eighth Amendment claim based on a prison doctor's deliberate indifference to an inmate's medical needs often depends on circumstantial evidence of culpability. *Petties*, 836 F.3d at 728; *Whiting*, 839 F.3d at 662. Unreasonable delays, the failure to follow a specialist's advice, or an apparent lack of effort to provide proper care provide clues from which a jury may infer culpability. *Petties*, 836 F.3d at 729-31. And because the governing standard requires *subjective* indifference, "[w]hen a doctor says he did not realize his treatment decisions (or lack thereof) could cause serious harm to a plaintiff, a jury is entitled to weigh that explanation against certain clues that the doctor *did* know." *Id.* at 731 (emphasis in original); *cf. United States v. Paulus*, 894 F.3d 267, 275 (6th Cir. 2018) (whether physician's diagnoses were made in good faith to bill government for responsive procedures was jury question).

In Dr. Larson's own words, Griffin presented with a "visible deformation" to his left arm when he met with a PA at Big Muddy shortly after his injury. In response, the

PA applied ice and ordered a sling as a first line treatment. But the PA also discussed Griffin's condition with Dr. Larson, and both agreed that a referral to an orthopedic specialist was in order. What is notable about Dr. Larson's immediate response to Griffin's injury is that he did not personally meet with Griffin until May 3, 2019, two weeks after the injury occurred. This is a significant delay in response to a visibly traumatic injury, for which the record reveals no explanation. One does not need to be a medical doctor to know that a bicep muscle tear can be an excruciatingly painful event requiring immediate medical attention beyond an ice pack. *See Petties*, 836 F.3d at 729 ("If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it."); *Berry v. v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (delay in medical treatment can support claim of deliberate indifference, especially when inmate is subjected to "prolonged and unnecessary pain."). And because Dr. Larson was notified of Griffin's injury yet waited two weeks to personally treat him, the appropriate thing to do on summary judgment is to leave the question of culpability to a jury. *See Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (two-day wait for doctor to treat open finger dislocation sufficient to state claim of deliberate indifference, even though pain medication was provided).

The same is true of Dr. Larson's decisions to prescribe Tylenol #3 for Griffin's pain following his first two surgeries. On two occasions, Dr. Young prescribed Griffin Norco 7.5 milligrams to manage his post-surgical pain. Both times, Dr. Larson prescribed him Tylenol #3 instead. Dr Larson argues that his decision to switch Griffin's prescribed pain

medication was based on availability at Big Muddy and that he considered Tylenol #3 to be an adequate "therapeutic substitute" for Norco. This Court is certainly not qualified nor permitted to second-guess Dr. Larson's judgment about each drug's therapeutic qualities.

But what gives the Court pause is that Dr. Larson testified that there were "no restriction[s]" on the types of pain medications available to Griffin. Bearing in mind the need to view the evidence in the light most favorable to the nonmoving party (*i.e.*, Griffin), Dr. Larson's testimony permits two inferences that doom his motion for summary judgment. First, if there were "no restriction[s]" on the pain medications available to Griffin, then the justification for disregarding Dr. Young's recommendation for Norco loses its muster. It is apodictic that a prison doctor's refusal to follow a specialist's treatment recommendation can be evidence of deliberate indifference. *Petties*, 836 F.3d at 729. A jury may well agree with Dr. Larson that his decision to prescribe Tylenol #3 instead of Norco was reasonable and appropriate under the circumstances; but it is their job to make that judgment, not this Court's.

Second, even if Norco was not readily available at Big Muddy to treat Griffin's pain, the record does not reveal any attempts by Dr. Larson to procure it. This, in turn, suggests that Dr. Larson simply chose the path of least resistance in treating Griffin's post-operative pain and is further evidence of subjective indifference that should be weighed by a jury, not this court. Dr. Larson cannot claim he was unaware of Griffin's pain and the need to address it with appropriate measures because Griffin submitted numerous grievances complaining about constant and "sharp" pain throughout the

three-and-a-half-year period of Dr. Larson's treatment of his injury. *See id.* at 730 ("If a prison doctor chooses an "easier and less efficacious treatment" without exercising professional judgment, such a decision can also constitute deliberate indifference.").

With these considerations in mind, summary judgment is not warranted on Griffin's Eighth Amendment claim against Dr. Larson.

## CONCLUSION

For these reasons, the Court **GRANTS** Dr. Young's motion for summary judgment (Doc. 87) and **DENIES** Dr. Larson's motion for summary judgment (Doc. 88).

The Court will schedule a telephonic status conference to discuss setting this matter for a jury trial. Counsel shall confer on the number of days needed for trial and be prepared to discuss their available dates.

**IT IS SO ORDERED.**

**DATED:  September 23, 2024**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**